**K MART CORPORATION, a Michigan corporation, Plaintiff,**

v.

**KNITJOY MANUFACTURING, INC., a foreign corporation; Leo F. Owyong and Daisy D. Owyong, individuals, Defendants.**

Civ. No. 80–74856.

United States District Court,
E. D. Michigan, S. D.

Dec. 21, 1981.

**154**

James C. Tuttle, Troy, Mich., Robert W. Steele, Robert E. Hebda, Edward C. La-Rose, Howrey & Simon, Washington, D. C., for plaintiff.

Roger K. Timm and Nancy Garlock Edmunds, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants.

## OPINION AND ORDER ON JURISDICTION

COHN, District Judge.

### I.

This action for breach of express and implied warranty and fraudulent misrepresentation in the sale of goods is before the Court on defendants' motion to dismiss for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2).

### A.

In late 1978 plaintiff K Mart Corporation (K Mart) entered into a series of negotiations with defendant Knitjoy Manufacturing, Inc. (Knitjoy) and its principal directors, officers and stockholders, Leo and Daisy Owyong, also named as defendants, which resulted in a contract for the manufacture of certain articles of clothing by Knitjoy for sale to K Mart. The negotiations on behalf of K Mart, a Michigan corporation, were handled by its Far Eastern subsidiary, Kresge-K Mart Ltd. of Hong Kong (K Mart HK), a foreign corporation, through a K Mart HK representative named Andrew Tam. All the spoken negotiations occurred in the Philippines, where Knitjoy is incorporated and has its principal place of business and where the Owyongs reside. Subsequent events occurred in Hong Kong and in the United States, although the Owyongs apparently never came to the United States between the onset of negotiations and the time this dispute arose.

### B.

The contract between K Mart and Knitjoy, which presumably consists of purchase orders, telexes, guarantees signed by the Owyongs as officers of Knitjoy and perhaps other documents, includes a requirement that clothing manufactured by Knitjoy and sold to K Mart for resale in the United States comply with all U.S. clothing regulations, including the Flammable Fabrics Act, 15 U.S.C. § 1191 et seq. (The Act).[1] K Mart contends in its complaint, which grounds subject matter jurisdiction in diversity under 28 U.S.C. § 1332, that the clothing manufactured by Knitjoy does not meet the requirements of the Act and therefore cannot be sold in the United States and is now being warehoused at K Mart's expense. The complaint alleges Knitjoy is liable for breach of warranty and fraudulent misrepresentation and alleges the Owyongs are individually liable for the fraudulent misrepresentation and as the "alter ego" of Knitjoy. Knitjoy and the

---

1. This is K Mart's view of the contract, which is accepted by the Court for purposes of this motion. *O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971).

Owyongs deny liability and assert various affirmative defenses, including lack of personal jurisdiction.

## II.

K Mart, a major retailer of numerous consumer items including clothing, is a Michigan corporation with its principal place of business in Troy, Michigan. It purchases clothing for sale at its retail stores through purchase orders issued directly from its Troy headquarters or through K Mart Apparel Corporation (K Mart NJ), a wholly-owned subsidiary incorporated in New Jersey.

Knitjoy is a Philippines corporation with its principal place of business and virtually all its offices and manufacturing facilities in Manila. It is not qualified to do business in any state of the United States, has no office in this country and has no product distributor, agent or representative in the United States. Knitjoy sells its products to wholesale buyers such as K Mart by means of purchase orders addressed to Knitjoy from these buyers or through brokers. Physical control and ownership of Knitjoy products is apparently often transferred to the buyer or broker outside the country of eventual resale. Since 1977 Knitjoy has sold at least $2–3 million worth of goods annually for ultimate distribution to at least 20 wholesale purchasers in the United States; in 1979 these sales totaled over $5 million. Approximately seven percent of Knitjoy's sales are made directly to this country.

Leo and Daisy Owyong are two of Knitjoy's seven directors, hold the offices of president and general manager (Leo) and executive vice-president (Daisy) and are two of seven Knitjoy stockholders; together they hold a majority interest in the corporation.[2] Both are residents of the Philippines and have travelled to this country three times between 1974 and 1980, though never between the onset of negotiations with K Mart and the time this dispute arose. Neither owns any real property in the United States, though Leo owns a 25% equity interest in a New York corporation.

## III.

The dealings between K Mart and Knitjoy began in September 1978.[3] Andrew Tam, a representative of K Mart HK, approached representatives of Knitjoy in the Philippines with an eye toward wholesale purchases of clothing for resale by K Mart in the United States. After oral negotiations in the Philippines with the Owyongs and Edgardo Almonia, Knitjoy export sales manager, follow-up telexes were sent by Tam to Knitjoy from Hong Kong confirming arrangements for Knitjoy to send clothing samples to Tam in Hong Kong and discussing price. (See Defendants' Exhibit (DX) A1–A6). Knitjoy sent samples to Tam in Hong Kong in October 1978 (DX–B), which it understood were to be sent by Tam to K Mart in Michigan where the final determination whether to purchase would be made (Answer ¶ 7b).

After receiving the samples from Tam in Michigan, K Mart issued a purchase order from its Troy headquarters for sweatshirts on November 4, 1978. (Plaintiff's Exhibit (PX)–B). The purchase order provided that "merchandise sold hereunder must be in compliance with . . . all applicable United States Federal . . . laws and regulations". Knitjoy then began purchasing the fabric necessary to manufacture the sweatshirts in Hong Kong in coordination with K Mart HK (DX–BB1–9).

On November 28, 1978, R. C. Otto, general manager of K Mart's import department in Troy, sent a letter to Knitjoy concerning trademark recognition. In the letter (PX–E) he asked that Knitjoy execute an agreement "to all the terms and conditions appearing on our Import Orders". A copy of such an order, identical to the November 4

---

2. These facts come from the initial and supplemental answers of defendants to interrogatories.

3. The summary which follows omits facts alleged by the parties in their rather lengthy pleadings because the Court is now concerned only with jurisdictional issues.

purchase order issued by K Mart, accompanied the letter and Knitjoy was advised by Otto to "read it through". Term # 9 on the back of these purchase orders reads in part:

"In any unsettled dispute hereunder wherein the amount in controversy exceeds $10,000 (US), it is hereby mutually agreed that either buyer or seller shall exercise any right or remedy in the United States District Court in Detroit, Michigan."

Otto also sent Knitjoy on November 28 a notice that a guarantee of compliance with the Act was required on each Knitjoy invoice and asked for a guarantee to that effect from Knitjoy. (PX–K). This appears to be the first time compliance with the Act (as opposed to general compliance with all United States laws) was specifically mentioned in writing.

On November 29 K Mart opened a letter of credit with Detroit Bank & Trust Company in Detroit, Michigan to the account of Knitjoy in anticipation of payment for the sweatshirts. (PX–H). The letter of credit specifically required presentation of the signed guarantee sent to Knitjoy on November 28 before the letter of credit could be drawn upon.

On December 18 two purchase orders were issued to Knitjoy by K Mart NJ for knit tops. (PX–C; PX–D). These purchase orders contained a different forum selection clause than was contained in the November 4 purchase order from K Mart. The December 18 purchase orders provided in term # 11 for exercise of any right or remedy in "any jurisdiction". Term # 6 provided that Knitjoy

"warrants . . . that the merchandise shipped under this order . . . is manufactured in compliance with all provisions and requirements of Federal . . . laws, including . . . the Flammable Fabrics Act."

Knitjoy then began ordering fabric for these orders in the same fashion as for the November 4 order.

On January 24, 1979 Knitjoy returned the signed agreements as requested in K Mart's November 28 letter. Each of the Owyongs signed a statement reading, "We have read and accept and agree to the above [the November 28 letter] in consideration of the merchandise Orders from the K Mart Corporation". (PX–E). Leo Owyong also signed a guarantee that each Knitjoy invoice would contain a guarantee of compliance with the Act. (PX–K). Each signature of Leo or Daisy Owyong either follows the typewritten name of "Knitjoy" or is accompanied by the Knitjoy corporate office held by the signer. The documents were accompanied by a cover letter signed by Almonia (PX–F), which stated in part:

"We are returning herewith your Import Order Terms and Conditions and Flammable Fabrics Guaranties duly signed in conformity and compliance with the conditions and instructions stated herein."

On February 7 K Mart NJ opened a letter of credit with Bank of America in New York to the account of Knitjoy for the clothing the subject of the December 18 purchase orders (PX–J). In contrast to the earlier letter of credit opened by K Mart in Michigan, this letter of credit contained no mention of guarantees of compliance with the Act.

During the first three months of 1979 K Mart HK complained to Knitjoy that the fabric purchased by Knitjoy for use in the garments to be sold to K Mart were subject to excess shrinkage and pilling. Production was stopped temporarily, modifications made and production continued after approval of new samples by K Mart HK (DX–H1–12) and apparently also by K Mart in Michigan (DX–J).

Production of the goods described in all three purchase orders was completed and shipment was made from April—June 1979 (DX–K1–12; DX–L1–3). Inspection certifications were issued in the Philippines by personnel of K Mart HK and also by personnel of K Mart in Michigan (DX–M1–11). Shipment was sent from Manila to various ports in the United States, including New York, Los Angeles, Longview, Washington and Savannah, Georgia. K Mart claims some of the merchandise was intended for

shipment to Michigan, though it is not clear from the record that Knitjoy was aware of that fact. The letters of credit were drawn upon by Knitjoy.

The problem of compliance with the Act arose shortly thereafter. K Mart instituted this action in December 1980.[4]

## IV.

### A.

Knitjoy claims it is not subject to personal jurisdiction in Michigan because it has not "transacted business" in Michigan as that term is used in the Michigan long-arm statute, M.S.A. § 27A.715 [M.C.L.A. § 600.-715][5] and does not have sufficient "minimum contacts" with Michigan so that the exercise of jurisdiction over it would comport with the "traditional notions of fair play and substantial justice" required by due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Knitjoy also argues the forum selection clauses contained in the K Mart purchase orders are either not part of the contract or are unenforceable and may not be interpreted as a consent by Knitjoy to personal jurisdiction in Michigan.

The Owyongs assert the same grounds as Knitjoy and in addition argue any action by them was taken in their capacities as officers of Knitjoy and not as individuals. They also argue their involvement with Knitjoy is not so pervasive as to permit the Court to "pierce the corporate veil" and treat Knitjoy as their "alter ego" so that every act of the corporation would be treated as an act of the Owyongs.

K Mart claims Knitjoy has consented to be sued in Michigan by virtue of its agreement in writing to the terms of the purchase orders, including the forum selection clauses. It also argues Knitjoy has both "transacted business" in Michigan and "caused . . . consequences to occur in [Michigan] resulting in an action for tort" so that it is subject to personal jurisdiction under the Michigan long-arm statute, M.S.A. § 27A.715(1) and (2) [M.C.L.A. § 600.715(1) and (2)] and that assertion of personal jurisdiction over Knitjoy under these circumstances satisfies due process requirements. K Mart asserts that since a corporate officer may be held individually responsible in Michigan for his torts, *Warren Tool Co. v. Stephenson*, 11 Mich.App. 274, 161 N.W.2d 133 (1968), the Owyongs' tortious misrepresentations subject them to personal jurisdiction in Michigan, or in the alternative that Knitjoy is but the "alter ego" of the Owyongs.

### B.

Based upon the analysis which follows, the Court holds:

1) Knitjoy has "transacted business" in Michigan within the meaning of

---

**4.** The motion to dismiss for lack of personal jurisdiction was filed on April 30, 1981. K Mart filed its response on May 27 and both defendants and K Mart filed reply briefs on June 9. At a hearing in chambers on June 11 the Court indicated it would deny defendants' motion as to Knitjoy but was inclined to grant the motion as to the Owyongs individually. K Mart asked for additional time for discovery on the question of personal jurisdiction over the Owyongs, which the Court is informed has occurred in the Philippines and elsewhere. On October 13, 1981 the Court entered a formal order denying defendants' motion to dismiss (so the case could proceed unencumbered by a pending motion while the Court completed this opinion). To the extent that order, which denied defendants' motion in its entirety, is inconsistent with this Opinion and Order, the October 13 order is vacated.

**5.** M.S.A. § 27A.715 [M.C.L.A. § 600.715] provides in part:

"The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:

(1) The transaction of any business within the state;

(2) The doing or causing any act to be done, or consequence to occur, in the state resulting in an action for tort . . . ."

M.S.A. § 27A.715(1) [M.C.L.A. § 600.-715(1)] and has sufficient minimum contacts with Michigan to properly subject it to the exercise of personal jurisdiction in Michigan;[6]

2) On the current state of the record, there is no basis for the exercise of personal jurisdiction over the Owyongs. Since the actions of the Owyongs were performed in their corporate capacities rather than as individuals[7] (PX–E; PX–K), they have committed no acts as individuals sufficient to fall within the relevant Michigan long-arm statute, M.S.A. §§ 27A.701, 27A.705 [M.C.L.A. §§ 600.701, 600.-705][8] nor to satisfy due process requirements. The record does not reveal that Knitjoy is the "alter ego" of the Owyongs so that the actions of Knitjoy may be considered in applying the jurisdictional tests to the Owyongs.[9]

## V.

### A.

The Michigan long-arm statute, available to K Mart pursuant to Fed.R.Civ.P. 4(e), provides for limited personal jurisdiction over a corporation whose relationship with the state arises out of "the transaction of any business within the state", where the cause of action asserted against the corporation arises out of that transaction of business. M.S.A. § 27A.715(1) [M.C.L.A. § 600.715(1)]. That statute confers on the state courts the maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment, *Microelectric Systems Corp. v. Bamberger's*, 434 F.Supp. 168 (E.D.Mich.1977), which requires that the defendant have such minimum contacts with the forum state that the exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice". *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292,

---

**6.** The Court will not consider whether Knitjoy has caused consequences to occur in Michigan resulting in a tort, M.S.A. § 27A.715(2) [M.C.L.A. § 600.715(2)] or whether Knitjoy has consented to personal jurisdiction in Michigan under M.S.A. §§ 27A.711(2) and 27A.745 [M.C.L.A. §§ 600.711(2) and 600.745] by its agreement to the forum selection clauses in the K Mart purchase orders. M.S.A. § 27A.711 [M.C.L.A. § 600.711] provides in part:

"The existence of any of the following relationships between a corporation and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise general personal jurisdiction over the corporation and to enable such courts to render personal judgments against the corporation:

. . . . .

(2) Consent, to the extent authorized by the consent and subject to the limitations provided in section 745 . . . ."

Whether clauses in the K Mart purchase orders are part of the agreement between K Mart and Knitjoy and, if so, whether they are enforceable are matters which will be more fully explored, since a guarantee of compliance with the Act and all federal regulations is one of the clauses in the K Mart purchase orders.

**7.** The acts of the Owyongs reflected in PX–E (the agreement to all terms in the purchase orders) and PX–K (the guarantee to provide a guarantee of compliance with the Act) are clearly undertaken in their corporate capaci-

ties. The form of the signature, the typewritten indication of the corporate name "Knitjoy" and in some cases delineation of the corporate office held by the signer in close proximity to the signature, are all evidence that these documents were signed by the Owyongs on behalf of the corporation rather than as individuals.

**8.** M.S.A. § 27A.701(3) [M.C.L.A. § 600.701(3)] which provides that consent is a basis for the exercise of general personal jurisdiction over individuals, is identical to M.S.A. § 27A.711(2) [M.C.L.A. § 600.711(2)] which applies to corporations. M.S.A. § 27A.705 [M.C.L.A. § 600.-705] is in all respects similar to M.S.A. § 27A.715 [M.C.L.A. § 600.715] set forth in note 5, *supra*, except that it applies to individuals rather than corporations.

**9.** *See* note 4, *supra*. Since K Mart has now deposed the Owyongs and other Knitjoy personnel and has received answers to interrogatories and documents, it should now be in a position to supplement the record on the "alter ego" issue if it desires. Accordingly, the Court will defer consideration of the Owyongs' motion for ninety days, during which time K Mart may have sixty days to file additional materials on this issue; the Owyongs shall respond within thirty days thereafter. Thereafter the Court will rule on the Owyongs motion. On the current record the motion to dismiss would be granted.

100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *International Shoe, supra.*

### B.

There is no doubt the activities of Knitjoy fall within the literal language of M.S.A. § 27A.715(1) [M.C.L.A. § 600.715(1)] or that it has sufficient minimum contacts with Michigan to comply with due process requirements. *See Com-Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp. 1229 (E.D. Mich.1971); *Raymond E. Danto Associates, Inc. v. Arthur D. Little, Inc.*, 316 F.Supp. 1350 (E.D.Mich.1970). Moreover, Knitjoy has engaged in activities "by which [it has] purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Shaffer v. Heitner*, 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977); *Khalaf v. Bankers and Shippers Insurance Co.*, 404 Mich. 134, 148, 273 N.W.2d 811 (1978). What is important is the quality rather than the quantity of the contacts, the interests of the forum state and convenience. *Khalaf, supra*, 404 Mich. at 149, 273 N.W.2d 811.

Knitjoy has at least the following contacts with Michigan, which taken as a whole constitute "transacting business" and meet due process requirements:

1) Knitjoy entered into an agreement to sell goods to K Mart, a corporation it knew to be incorporated and headquartered in Michigan.

2) Knitjoy has for several years placed its products in the "stream of commerce" to be sent either directly or through brokers to various wholesale purchasers in the United States. Knowing its products were being shipped to this country, certainly it was reasonable and foreseeable that some of the products sold to K Mart, a Michigan corporation, would eventually end up in K Mart's home state.

3) Knitjoy communicated repeatedly and directly with K Mart headquarters in Troy, sent and received documents to and from Troy and sent samples to Hong Kong knowing they would be sent to Troy for ultimate approval by K Mart in Michigan, which Knitjoy knew was a pre-condition to the sale. *See* PX–E; PX–F; PX–I; PX–K; PX–L; PX–M.

4) Knitjoy drew on letters of credit established by K Mart or K Mart NJ on its behalf with banks located in the United States, and on one occasion in Michigan.

5) Knitjoy has derived substantial sales revenue from its sales to K Mart.

6) If Knitjoy is not subject to personal jurisdiction in Michigan, it is unlikely it may be sued anywhere in the United States. Certainly an action brought in a state where Knitjoy's products entered the United States (New York, California, Georgia or Washington), even if personal jurisdiction over Knitjoy could be successfully asserted, would be less convenient for the parties and witnesses than is this action in Michigan.

### C.

The conclusion that Knitjoy may be subjected to personal jurisdiction in Michigan comports with recent Michigan case law and expressions from the Court of Appeals for the Sixth Circuit.

In *Khalaf, supra*, the Michigan Supreme Court held that the allegedly negligent failure of an Illinois insurance agent to procure adequate insurance for an Illinois corporation which subsequently committed a tort in Michigan did not render the agent subject to long-arm jurisdiction in Michigan, since that connection alone between the state and the agent was not a sufficient minimum contact to comport with due process. A contrary holding would have subjected all insurance agents wherever located to personal jurisdiction in Michigan whenever the agent's client commits a tort in the state. Knitjoy's contacts with Michigan are clearly greater, if for no other reason than whatever legal wrongs were committed in Michigan were committed by Knitjoy itself.

In *Hapner v. Rolf Brauchli, Inc.*, 404 Mich. 160, 273 N.W.2d 822 (1978), the Michigan Supreme Court held that a Swiss corporation which sold hair dryers only to independent importers in New York, Illinois and California did not have sufficient contact with Michigan for the exercise of personal jurisdiction when its hair dryer was eventually sold in Michigan and injured its user in the state. There was no evidence that the Swiss corporation had any marketing system in Michigan or had reason to know its products were sold outside New York, Illinois and California. By contrast, in addition to Knitjoy's other contacts with Michigan, Knitjoy did business with a corporation it knew to be headquartered in Michigan and either knew or should have reasonably known that its clothing would be sold in states beyond the products' port of entry, including Michigan.

The Court of Appeals for the Sixth Circuit held in *Chrysler Corporation v. Fedders Corporation, et al.*, 643 F.2d 1229 (6th Cir. 1981), that personal jurisdiction could not be asserted under the Michigan long-arm statute over a Spanish corporation whose only contact with Michigan was the acts of its alleged coconspirators as part of an agreement to violate the antitrust laws. Once again, not only are Knitjoy's contacts with Michigan greater in both quality and quantity than in *Chrysler*, the acts claimed to be wrongful were committed by Knitjoy itself rather than by a third party. That Knitjoy should now have to answer for its own actions hardly offends "traditional notions of fair play and substantial justice". *International Shoe, supra.*

This case is analytically and factually similar to *Ross v. Spiegel, Inc.*, 53 Ohio App.2d 297, 373 N.E.2d 1288 (Ct.App.1977). There a Hong Kong manufacturer of pajamas and its Hong Kong subsidiary were sued in Ohio after a resident of that state was injured in a fire allegedly due to the flammable nature of the fabric used in the pajamas. The court upheld the exercise of personal jurisdiction over both corporations even though the pajamas had been sold to independent importers in the United States, saying:

"The due process test of fair play and substantial justice is satisfied where the defendant, a large company, derives substantial sales revenue from the United States market place even though its sales are made outside the state of Ohio for distribution wherever the immediate purchaser of the product deems best. The facts elicited in this case satisfy the due process standard. There is no constitutional impediment toward exercising jurisdiction over the Hong Kong defendants."

373 N.E.2d at 1293.

Knitjoy argues that *Ross* is inapplicable since jurisdiction was based on that portion of the Ohio long-arm statute concerning torts, similar to M.S.A. § 27A.715(2) [M.C. L.A. § 600.715(2)], and due process concerns are more easily satisfied in personal injury actions than in "contract" actions such as the case at bar. The Court is not persuaded. Knitjoy cites no cases evidencing a dual standard for due process analysis depending upon the nature of the action or the character of the plaintiff. Moreover, K Mart also pleads in its complaint the tort of fraudulent misrepresentation, which might provide an additional basis for personal jurisdiction under M.S.A. § 27A.715(2) [M.C. L.A. § 600.715(2)].[10] Finally, there is no state in the United States with which Knitjoy has greater contacts regarding the claims involved in this case than Michigan, and thus no state has a greater interest in the determination of this dispute. Under all of the circumstances, the exercise of personal jurisdiction over Knitjoy in Michigan pursuant to M.S.A. § 27A.715(1) [M.C. L.A. § 600.715(1)] comports with due process.

## VI.

For the reasons above, Knitjoy's motion to dismiss for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), is DENIED. The Owyongs' motion to dismiss continues.

10. *See* note 6, *supra.*

Within ninety days time the parties may file additional materials as described in note 9, *supra*, based on discovery conducted since the motion was filed.

SO ORDERED.